2011 WL 3881476
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington, at Seattle.

Evan GEORGE, Plaintiff,
v.
NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, Defendant.

No. C10–668–RSM.
|
Sept. 1, 2011.

**Attorneys and Law Firms**

David Hugh Smith, John B. Crosetto, Garvey Schubert Barer, Seattle, WA, for Plaintiff.

James E. Howard, Stephanie L. Beers, Dorsey & Whitney, Seattle, WA, for Defendant.

ORDER ON MOTIONS

RICARDO S. MARTINEZ, District Judge.

**I. INTRODUCTION**

**\*1** NW moves for summary judgment on each of Dr. George's causes of action. NW asserts that Dr. George's claims must be dismissed because his claims are time barred by the limitations period set out in his insurance contracts; he failed to comply with the notice and proof of disability provisions in his policies; he cannot present any admissible evidence that he was disabled between 2002 and 2005; and NW acted reasonably in denying Dr. George's claim. Dr. George moves for partial summary judgment on the single issue that he meets all criteria for "partial disability" as that term is defined in NW's policies.

**II. DISCUSSION**

**A. Background**
Dr. George purchased four disability insurance policies from NW over the course of the last two decades. Each policy provides for the payment of benefits upon "total disability" or "partial disability." Under each policy, "the Insured is totally disabled when he is unable to perform the principal duties of his occupation." Dkt. # 45, Exs. A, B, C § 1.2. *See also* Dkt. # 45, Ex. D § 1.4 ("[T]he Insured is totally disabled when unable to perform the principal duties of the regular occupation."). The insured is partially disabled when "he is unable to perform one or more of the principal duties of his occupation; or to spend as much time at his occupation as he did before the disability started; and he has at least a 20% Loss of Earned Income." *Id.* at Exs. A, B, C, § 1.3. *See also id.* at Ex. D § 1.5 (providing that the Insured must additionally be "gainfully employed in an occupation" to qualify for partial disability benefits). The first three policies define "occupation" as "the occupation of the Insured at the time he becomes disabled." *Id.* at Exs. A, B, C, § 1.1. The fourth policy additionally provides that "[i]f the Insured is exclusively engaged in [ ] a medical or dental specialty for which board certification is available; or the specialty of trial law that specialty is the 'regular occupation'."

Dr. George began practicing at Eastside Pathology in 1991. During his tenure there, he worked as a pathologist primarily at Overlake Hospital, where he performed the following tasks an average of 58 hours per week:

**\*2** • 80% Microscopic examination of specimens;

• 10% Intraoperative consultation and specimen evaluation; and

• 10% Administrative, supervisory and educational activities.

In 2000, Dr. George applied for a prestigious dermatopathology fellowship at the University of Virginia ("UVA"), was strongly recommended by his colleagues at Eastside Pathology, and was offered a position. Ultimately, Dr. George decided to turn down the position because Eastside Pathology would not guarantee him a position upon his return. He wrote to UVA expressing an interest to pursue the fellowship at a later date.

Dr. George reports symptoms of a cervical repetitive stress injury thought related to the postural demands of working with a microscope since the late 1990s. His medical records indicate that he first reported neck pain in May 1998. In April 2002, Dr. George took a voluntary leave of absence to examine his life, mental and physical health, and career choices. Shortly before his return to work in September 2002

Dr. George was involved in a head-on collision with a pick-up truck. The accident greatly aggravated his upper back and neck pain. Dr. George claims that, "[i]n hindsight, from September 2002 forward, I was never able to perform my job without significant pain." Dkt. # 69, Ex. B (explanatory letter written by Plaintiff upon submitting disability claim).

Dr. George continued working at Eastside Pathology until 2004 when the board decided that it would not be hiring additional doctors to decrease the workload of existing doctors. Dr. George resigned and began seeking a part time academic appointment. He was offered and ultimately accepted an academic position at the University of Washington ("UW") as a clinical professor. He purportedly intended to return to private practice, possibly opening his own practice, at a later date. Coincidentally, a position in the UVA fellowship program also opened up in 2004. Dr. George decided to pursue the prestigious UVA fellowship and notified UW that he would have to rescind his acceptance. In 2005, upon Dr. George's completion of the UVA fellowship, Dr. George was again able to secure a position teaching at UW.

Dr. George currently works at the UW Medical Center, where he is expected to provide general surgical pathology, dermatopathology and autopsy pathology, and is responsible for teaching residents in Anatomic Pathology. He works 10–12 hours per day 4 days per week. He states his hours are allocated as follows:

- 26% Microscopic examination of dermatopathology specimens;

- 7 % Microscopic examination of general pathology specimens;

- 7 % Intraoperative specimen evaluation;

48% Education, research, administrative activities; and

12 % teaching and supervision of physician trainees.

Dr. George notified NW of a potential disability claim in March 2007. In July 2007, Dr. George submitted a completed Request for Disability Benefits. He claimed a disability resulting from a repetitive stress injury caused by years of using a microscope, and greatly exacerbated by the 2002 car accident. He claimed that his disability prevented him from returning to his lucrative career as a private practice dermatopathologist after he left in 2004 and/or that he was forced to leave Eastside Pathology because of his disability. NW denied his claim and this lawsuit ensued.

## B. Standard of Review

**\*3** Summary judgment is appropriate where "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FRCP 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.,* 41 F.3d 547, 549 (9th Cir.1994) (citing *O'Melveny & Meyers,* 969 F.2d at 747). Material facts are those which might affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248.

The Court must draw all reasonable inferences in favor of the non-moving party. See *F.D.I. C. v. O'Melveny & Meyers,* 969 F.2d 744, 747 (9th Cir.1992), rev'd on other grounds, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

## C. Motion to Consolidate Summary Judgment Hearings

In light of the ample record before it, the Court finds oral argument on the parties' motions for summary judgment unnecessary. Plaintiff's Motion to Consolidate Summary Judgment Hearings (Dkt.# 60) is hereby DENIED.

## D. Defendant's Motion for Leave to Supplement Summary Judgment Record with Newly Discovered Evidence and to Amend Answer

### 1. *Effect of Arbitration Decision*

On August 10, 2011, NW moved for leave to supplement its motion for summary judgment with newly discovered evidence. Dkt. # 88. NW presented the Court with a binding arbitration decision memorializing findings in Dr. George's prior litigation against State Farm Insurance Company for alleged injuries sustained during the 2002 accident that purportedly exacerbated Dr. George's neck condition. Dkt. # 89, Ex. A ("Arbitration Decision"). NW argues that the

Arbitration Decision is dispositive as to the issue of whether Dr. George left Eastside Pathology because of neck and back pain and should be considered by the Court in its order on summary judgment. It explains that it could not have produced the Arbitration Decision earlier because Dr. George failed to produce it in discovery and because it only received the decision from State Farm Insurance Company on August 3, 2011. Dr. George asks the Court to disregard the Arbitration Decision, citing NW's failure to exercise reasonable diligence prior to the close of the discovery period and failure to cite any procedural rule entitling it to supplement its motion. Dr. George also argues that the Arbitration Decision is not dispositive in this action because the arbitrator was tasked with determining whether Dr. George left Eastside as a result of the auto accident—a wholly different question than whether Dr. George left Eastside as a result of his neck injury.

**\*4** As to the procedural issue, the Court GRANTS NW's motion to supplement the record. The Court has discretion to provide a party opportunity to support a fact. *See, e.g.,* Fed.R.Civ.P. 56(e) ("If a party fails to properly support an assertion of fact ... the court may: give an opportunity to properly support or address the fact."). While NW's motion was not brought pursuant to Rule 56(e), the Arbitration Decision is directly relevant to the central issues in this matter and to disregard it simply because it was discovered outside the discovery period would not serve the interests of justice nor the Court's duty to provide a fair and full adjudication of this matter on the merits. *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1) (holding summary judgment procedure is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' "). Dr. George presents no evidence that NW acted in bad faith in failing to bring the Arbitration Decision to the Court at an earlier date. Accordingly, it shall be considered with the remainder of the evidence.

As to the substantive issue of how the Arbitration Decision affects NW's motion for summary judgment, the Court finds that the issue of whether Dr. George left Eastside Pathology because of the 2002 auto collision was actually decided and has preclusive effect in this litigation. The issue of whether Dr. George left Eastside Pathology because of neck and back pain was not necessary to the judgment and does not have preclusive effect.

The doctrine of issue preclusion prevents relitigation of all "issues of fact or law that were actually litigated and necessarily decided" in a prior proceeding. *Segal v. American Tel. & Tel. Co.,* 606 F.2d 842, 845 (9th Cir.1979). Under the doctrine of collateral estoppel, once a court or arbitrator has "decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a different cause of action involving a party to the prior case.*" U.S. v. Geophysical Corp. of Alaska,* 732 F.2d 693, 697 (9th Cir.1984) (internal citation omitted). "In both the offensive and defensive use situations the party against whom estoppel [issue preclusion] is asserted has litigated and lost in an earlier action." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

The "pivotal question" in the Arbitration Decision was "whether Dr. George would have stayed at EPI for that additional five years, saving enough money to begin a private dermapathology practice, if this accident had not occurred in 2002." Dkt. # 89, Ex. A, p. 2. The arbitrator was "simply not persuaded that it was the injuries sustained in this accident which caused [Dr. George] to leave [Eastside Pathology] in 2004." *Id.* at 3. Thus, the issue of whether Dr. George left Eastside Pathology because of the 2002 car accident was actually litigated and necessary to the arbitrator's decision on damages. Dr. George was a party to that litigation, and did not prevail on this issue. Accordingly, the arbitrator's decision on this issue has preclusive effect in the instant litigation.

**\*5** NW argues that the issue of whether Dr. George left Eastside Pathology because of neck and back pain was likewise decided in the Arbitration Decision and should have preclusive effect in the case at bar. NW points to the sentence in the Arbitration Decision that reads, "the evidence does not allow me to conclude that it was neck and back pain that led to his decision in April 2004 to resign from [Eastside Pathology]." *Id.* at 2. However, this language does not seem to support the arbitrator's later conclusion that Dr. George's post–2002 pain resulted from his profession working with a microscope:

> As to general damages, I do not doubt that Dr. George was uncomfortable following this accident. His profession probably made his symptoms worse for a period of time. After that period, however I am not persuaded that the complaints that Dr. George expresses are the result of this accident; after a reasonable time, I find the complaints he is making *are simply the result of being a "microscope jockey".*

*Id.* at 3 (emphasis added). Further, whether Dr. George left Eastside Pathology because of neck and back pain, generally speaking, was not necessary to the Arbitration Decision. The Arbitration Decisions focused solely on damages arising from the car accident. *See* Dkt. # 89, Ex. A, p. 1. ("I am asked to decide solely the nature of the injury to Dr. George arising out of the accident of August 28, 2002 and the damages to which he is entitled.") Accordingly, any determination by the arbitrator regarding the issue of whether Dr. George left Eastside Pathology in 2004 as a result of neck and back pain does not have preclusive effect in the case at bar.

2. *Motion to Amend*

NW seeks leave to amend its answer to add an affirmative defense of issue preclusion. Pursuant to Fed.R.Civ.P. 15(d), "a court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." The purpose of this provision is to "promote as complete an adjudication of the dispute between the parties as possible." 6A Charles Alan Wright et al., *Federal Practice and Procedure* § 1504 (2d ed.1990). Further, a "court should freely give leave [to amend] when justice so requires," Fed.R.Civ.P. 15(a)(2), and there is a general "policy to permit amendment with extreme liberality." *Chodos v. West Publ'g Co.,* 292 F.3d 992, 1003 (9th Cir.2002) (internal citations omitted). "When considering a motion for leave to amend, a district court must consider whether the proposed amendment results from undue delay, is made in bad faith, [or] will cause prejudice to the opposing party." *Id.* The Court does not find that NW's motion for leave to amend was made in bad faith or resulted from dilatory discovery practices. It will not cause prejudice to Dr. George because Dr. George has been aware of the Arbitration Decision since it was issued in 2005. Accordingly, the Court GRANTS NW's Motion for Leave to Amend. NW shall file an amended answer within *7 days* of this order.

**E. Defendant's Motion for Summary Judgment**

**\*6** NW moves for summary judgment dismissing each of Dr. George's claims as a matter of law. As set forth below, NW's motion is GRANTED in part and DENIED in part.

1. *Notice and Proof of Loss Provisions*

NW seeks summary judgment dismissing Dr. George's claims on the basis that he failed to provide timely notice and proof to NW, as required by his insurance contracts.

*a. Notice of Claim Provisions*

With respect to the notice requirement, each of Dr. George's policies provides that "[w]ritten notice of claim must be given to the Company within 60 days after the start of any loss covered by this policy. If the notice cannot be given within 60 days, it must be given as soon as reasonably possible." Dkt. # 45, Exs. A, B, C § 4.1; D § 5.1. Dr. George claims that a 2002 auto accident "ended [his] ability to perform his principal duties." Dkt. # 2, ¶ 10. However, Dr. George did not submit a notice of claim until March 2007. Dkt. # 69, Ex. B–1. Thus, it is undisputed that Dr. George did not provide notice of his claim within 60 days of any loss. Therefore, with respect to the notice of claim provisions, the question the Court must ask is whether there is any disputed issue of material fact concerning whether Dr. George gave notice to NW of his disability "as soon as reasonably possible".

In determining whether notice is given as soon as reasonably possible, the correct standard is "whether or not a reasonably prudent person would have acted or failed to act in the same or similar circumstances." *Kaplan v. Northwestern Mutual Life Ins. Co.,* 100 Wash.App. 571, 575 (2000). "What is reasonable must be measured by what a reasonably prudent man would believe in like circumstances." *Id.* (quoting *State Farm Mutual Auto. Ins. Co. v. Erickson,* 5 Wash.App. 688, 692, 491 P.2d 668 (1971).

In his Opposition to NW's Motion for Summary Judgment, Dr. George asserts that he "did not realize he would never be able to return to private practice until 2007, when he realized that even with ergonomic adjustments, his condition would not allow him to spend 90% of his day at the microscope." Dkt. # 70, p. 10. There is some evidence to support this claim. Dr. George's letter to NW, filed concurrently with his Request for Disability Benefits explains that in 2005, he "was still hopeful [his] pain could be alleviated." *Id.* at Ex. B–10, p. 6. However, by 2007, he wrote that, "[d]espite all of these efforts, my problems persist, and it is a struggle for me to perform my duties at work—even though the demands are much lower than those in a private practice setting. *I no longer think it is realistic for me to start a private Dermatopathology Laboratory* since I can barely meet the modest demands of my current job." *Id.* at p. 6–7, 491 P.2d 668.

On the other side of the equation, there is substantial evidence that Dr. George knew of his disability well before 2007, the year he filed his claim. Dr. George sought medical treatment following the 2002 car accident and was diagnosed with

cervical strain/ neck strain. Dkt. # 45, Ex. I, pp. 39–40. Thereafter, he claims to have found it increasingly difficult to complete his microscopic slide review and had to take work home and come in on weekends to keep up. Dkt. # 68, Ex. 7, pp. 51–52. Then, in 2004, Dr. George left his job at Eastside Pathology, purportedly because of his inability to perform the principal duties of that occupation. Dr. George asserted on multiple occasions to NW and to the Court that he left Eastside Pathology precisely because he was unable to perform the principal duties of that occupation. *See* Dkt. # 69, Ex. B–10, p. 41 ("I *knew* that I could not tolerate the pain, headaches, and fatigue associated with my job for another 15 months without incurring further health deterioration.") (emphasis in original); Dkt. # 45, Ex. H, p. 4 ("I ... submitted my resignation letter, effective July 1, 2004. I knew that I would not be able to meet the job demands for another year and a half ..."); Dkt. # 50, p. 16 ("Dr. George took the position at the University of Washington for the very reason that he was unable to perform his principal duty of spending 90% of his time at the microscope."); Dkt. # 70, p. 3 ("Dr. George resigned from his senior partner position at Eastside Pathology, Inc. in July, 2004 due to neck pain and fatigue that reduced his ability to perform his principal duties ...").

 **\*7**  In 2005, Dr. George filed a lawsuit against the driver of the pickup truck involved in the earlier collision. Dkt. # 73, Ex. A. In his complaint against that driver, Dr. George claims that "[a]s a direct and proximate result of the August 28, 2002 collision, Plaintiff sustained severe permanent personal injuries and damages." *Id.* at ¶ 3.4, 491 P.2d 668. All of this evidence supports a finding that, if Dr. George suffers from a disability caused by years at the microscope, and exacerbated by the 2002 car accident, he was aware of that disability at some point before 2007.

Nonetheless, the Court cannot rule that Dr. George's failure to provide notice and proof of loss to NW at an earlier date was unreasonable as a matter of law. The Court is required to construe the evidence in favor of the non-movant, Dr. George. *F.D.I.C. v. O'Melveny,* 969 F.2d at 747. A jury could reconcile the above evidence indicating that Dr. George knew of his purported disability with Dr. George's assertion that "he did not realize he would never be able to return to private practice until 2007," by inferring that Dr. George knew that he suffered from any injury as early as 2002, but he did not realize until 2007 that his injury would become so severe that it would completely render him unable to return to private practice. Under these circumstances, a reasonable jury could conclude that Dr. George provided notice to NW "as soon as reasonably possible." *See Kaplan,* 100 Wash.App. at 575. Summary judgment is unwarranted on this basis alone.

 *b. Proof of Loss Provisions*

The proof of loss provisions contained in Dr. George's disability policies are similar to the notice of claim provisions, except that several of them have outer time limits. Each of the policies provide that "[w]ritten proof of disability must be given to the Company within 90 days after the end of each monthly period for which benefits are claimed. If the proof is not given within 90 days, the claim will not be affected if the proof is given as soon as reasonably possible." Dkt. # 45, Ex. A § 4.3. Three of the four disability policies contain provisions limiting the time period that proof of loss may be submitted. The second and third policies provide that, "[i]n any event, the proof required must be given no later than *one year* after the end of each monthly period for which benefits are claimed unless the Owner was legally incapacitated." Dkt. # 45, Ex. B, C § 4.3. The fourth policy provides that, "[i]n any event, the proof required must be given no later than *one year and 90 days* after the end of each monthly period for which benefits are claimed unless the Owner was legally incapacitated." Dkt. # 45, Ex. D § 5.1.

Dr. George submitted claim forms, an Attending Physician Statement, financial statement, and a 12–page cover letter to NW in July, 2007. Dkt. # 69, Ex. B–10. The forms were submitted well past the 90–day deadline for a loss purportedly beginning in 2004 but, as above, there is a genuine issue of material fact regarding whether the 2007 submission was "as soon as reasonably possible," as required under the policies. Since the first policy does not contain an outer limit on what constitutes a reasonable delay for submitting proof of loss, and there is a genuine issue of material fact concerning whether it was objectively reasonable, the proof of loss provision does not bar recovery under that policy. With respect to the other three policies, Dr. George is claiming benefits prior to July/April 2006, so he has breached the contract provision providing that he will submit proof of loss within 1 year/1 year and 90 days.

 **\*8**  Although Dr. George has undisputedly failed to comply with three of the contracts' proof of loss provisions, under Washington's notice-prejudice rule, an insurer may not deny benefits on the basis of the insured's failure to comply with the policy unless it can show actual prejudice caused by the delay. *Oregon Auto. Ins. Co. v. Salzberg,* 85 Wash.2d 372, 535 P.2d 816 (1975); *Safeco Title Ins. Co. v. Gannon,* 54 Wash.App. 330, 336, 774 P.2d 30 (1989). The notice-

prejudice requirement applies to disability insurance claims, *Kaplan,* 100 Wash.App. at 579, and "[t]he existence of prejudice is ordinarily a question of fact and the burden of proof is on the insurer," *id.* at 578.

NW states that it was prejudiced by Dr. George's failure to comply with the proof of loss provisions because filing the claim so many years after the onset of the injury prevented it from: "conducting its own independent medical examination of Dr. George while he was working at EPI to determine the nature and extent of his claimed condition." Dkt. # 43, p. 16 (citing Dkt. # 44, ¶ 6). It further asserts that Dr. George's former EPI colleagues "cannot recall" many of the material facts and Dr. George's workstation is no longer available for examination. *Id.* (citing Dkt. # 44, ¶¶ 5, 7; Dkt. # 45, Ex. AA 26:21–29:7, 33:2–12, 36:5–9, 62:22–63:16 & Ex. Z 36:16–25, 71:7–25, 86:3–19). NW claims that its "inability to have Dr. George examined while he was working in the allegedly disability inducing environment, or to examine the environment itself, was a concrete detriment to [NW's] investigation of this claim." *Id.*

Dr. George argues that NW's delay argument is inconsistent with NW's denial of his claim on bases other than delay and that NW is estopped from arguing that Dr. George's claim was untimely at such a later juncture. Moreover, he disputes that NW suffered prejudice by the delay, citing the fact that NW denied his initial claim based on historical medical records alone, all of which were made available to NW when it investigated his claim in 2007.

To qualify for relief under a theory of equitable estoppel, a party must show "(1) an admission, statement, or act, inconsistent with the claim afterwards asserted; (2) action by the other party on the faith of such admission, statement, or act; and (3) injury to such other party arising from permitting the first party to contradict or repudiate such admission, statement, or act." *Peterick v. State,* 22 Wash.App. 163, 177, 589 P.2d 250 (1977). NW's failure to deny Dr. George's claim on the basis that it was time-barred is not "an admission, statement or act" that is inconsistent with arguing, during litigation, that it has that defense available to it. In addition, NW sent several letters to Dr. George indicating that his failure to promptly file his claim could result in a longer claims process. *See, e.g.,* Dkt. # 69, Exs. B–8 & B–17. NW is not estopped from arguing that Dr. George's claim is time-barred.

**\*9** Nonetheless, NW bears the burden of proving that it suffered prejudice as a result of Dr. George's breach of his insurance contracts. *Canron, Inc. v. Federal Ins. Co.,* 82 Wash.App. 480, 485, 918 P.2d 937 (1996). Prejudice in this context is "ordinarily a question of fact". *Id.* Here, there is a disputed issue of material fact regarding whether NW suffered prejudice by Dr. George's failure to submit proof of loss during the time period required under the polices. The record is not so substantial in NW's favor that no reasonable jury could find that NW was not so prejudiced. Accordingly, summary judgment is inappropriate on this issue.

2. *Contractual Limitations Period*

NW argues that Dr. George's claims are barred by the contractual limitations period of his disability policies. Each of the policies provide, "[n]o legal action may be brought after three years (or a longer period that is required by law) from the time written proof is required to be given." Dkt. # 45, Exs. A, B, C § 4.7; D § 5.4. Since, as noted above, there is a genuine issue of material fact regarding whether Dr. George breached the policy with respect to proof of loss on his first policy (for which there was not outer time limit), there is likewise a genuine issue of material fact regarding whether he brought his legal action within three years "from the time written proof is required to be given," with respect to that policy.

This matter comes before the Court's upon Defendant's Motion for Summary Judgment (Dkt.# 43); Plaintiff's Motion for Partial Summary Judgment (Dkt. # 50); Plaintiff's Motion to Consolidate Summary Judgment Hearings (Dkt.# 60); and Defendant's Motion for Leave to Supplement Summary Judgment Record with Newly Discovered Evidence (Dkt.# 88). Plaintiff Evan George, M.D. ("Dr.George") is a pathologist who submitted a claim for disability coverage under four policies with Defendant Northwestern Mutual Life Insurance Company ("NW"). NW denied Dr. George's claim and Dr. George filed the instant law suit, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the Washington Insurance Fair Conduct Act, and Violation of the Unfair Trade Practices and Consumer Protection Law. The latter of the three causes of action allege that NW acted in bad faith in denying Dr. George's claim.

As for the other three policies, the limitations period bars some portion of recovery as a matter of law. The time period for which recovery is barred is any period greater than "three years ... from the time written proof is required to be given." *Id.* Written proof is required to be given, at the latest, *one year*

after the end of each monthly period for which benefits are claimed," (for policies two and three) or "*one year and 90 days* after the end of each monthly period for which benefits are claimed" (for policy four). Dkt. # 45, Exs. B, C § 4.3 & Ex. D § 5.1. Combining these two provisions, Dr. George is precluded from bringing an action with respect to any monthly period that occurred more than four years prior to March 10, 2010, when he filed his complaint in King County Superior Court (or four years and 90 days, for the fourth policy). Thus, the earliest date that Dr. George can claim benefits under the second and third policies is March, 2006. The earliest date that he can claim benefits under the fourth policy is December, 2005.

NW argues that the fact that Dr. George can only recover under three of the policies for time periods occurring in December 2005/March 2006 and beyond completely bars his recovery under each of these policies. NW reasons that, since Dr. George has been continuously employed at UW since 2005, he cannot claim "at least a 20% Loss of Earned Income," which is a prerequisite for partial disability recovery under each of the policies, between December 2005 and today. Dkt. # 45, Exs. A–C § 1.3 & Ex. D § 1.5. Similarly, because he continues to perform all of his principal duties as a professor at UW, he is not eligible for benefits for total disability under any of the policies. Dr. George argues that the limitations period may limit recovery for months occurring prior to the cut-off date, but does shift the onset date, and therefore does not constitute a complete bar to recover. The Court agrees.

**\*10** It does not appear that Washington courts have examined the issue of whether a contractual limitations period that is triggered by a proof of loss provision such as that at issue here precludes all suits that occur after the limitations period expires or simply limits recovery to the monthly periods that fall within the limitations period. Defendants cite one Pennsylvania district court case that rejected a "continuing violation theory," akin to the one advanced here by Dr. George. [Yingling v. UNUM Life Ins. Co. of America, 959 F.Supp. 251 (M.D.Pa.1997)](). There, the Court held that be "[t]he purpose of a statute of limitation is to bar stale claims and avoid problems of proof arising from stale memories," and the theory propounded by plaintiffs "would hinder and frustrate the ultimate aim of limitations periods." [Id. at 259–260]() (internal quotations omitted). The Court disagrees with this reasoning as it applies to disability cases.

Where, as here, an insured alleges that he has been continuously disabled since the original onset of the disability, the purposes behind a limitations period are satisfied by precluding recovery for periods of disability that occurred prior to the start of that period. Indeed, "problems of proof arising from stale memories" would necessitate that an insurer not be liable for periods of disability that occurred several years antecedent to the lawsuit. However, where the insured claims to be presently disabled, those problems of proof are not present as to the insured's *present* disability— which the insured can investigate through medical records, examinations, and the like. The fact that problems of proof may exist with respect to the *onset* of disability does not compromise an insurer's investigation so thoroughly that an insured should be precluded from ever claiming benefits for a disability that could very well affect him for the remainder of his lifetime.

In any case, the language of the insurance contract does not support NW's interpretation. Proof of loss must be submitted within a specified period of time "after the end of each monthly period for which benefits are claimed." Dkt. # 45, Exs. A, B, C § 4.3, Ex. D § 5.1. The contractual limitations period is tied to the deadline for submission of proof of loss. *Id.* at Exs. A, B, C, § 4.7, Ex. D § 5.4. Accordingly, the contractual limitations period limits legal claims for "each monthly period for which benefits are claimed," prior to the limitations cut-off. An insured is precluded from recovering "monthly periods" prior to the cut-off, not from recovering at all. To read into these provisions a complete bar to recovery for any continuing disability that first appeared prior to the cut-off date would be to rewrite the contract. See [Panepinto v. New York Life Ins. Co., 90 N.Y.2d 717, 721, 665 N.Y.S.2d 385, 688 N.E.2d 241(1997)]() (rejecting a similar theory and collecting cases). Accordingly, Dr. George is barred from recovering benefits for any monthly period occurring before the contractual limitations cut-off date. NW's motion for summary judgment is GRANTED with respect to any such benefit. Dr. George is not barred by the contractual limitations clause from recovering for monthly periods occurring thereafter.

3. *Breach of Contract*

**\*11** NW moves for summary judgment on Dr. George's breach of contract claim. NW argues that Dr. George's post-disability hours, tasks, and compensation were greater than his predisability hours, tasks, and compensation at Eastside Pathology. NW further contends that Dr. George has worked at all times as a pathologist and therefore has no claim to presently assert under his policies. Dr. George counters that he has presented evidence that between 2002 and the

present he was progressively unable to work long hours at the microscope.

First, the Court addresses NW's contention about Dr. George's work at Eastside Pathology. Dr. George's claim for monthly benefits between 2002 and 2005 was dismissed above for falling outside the contractual limitations period. *See* Part II(D)(2), *supra.* Therefore, the Court need not decide whether Dr. George was disabled as defined by the policies during that time period. However, the Court agrees that Dr. George could not have been disabled during his time at Eastside Pathology because he remained continuously employed, did not change duties, and did not suffer a reduction in income.

Second, the Court addresses Dr. George's "occupation." As recounted previously, under each of Dr. George's policies, "the Insured is totally disabled when he is unable to perform the principal duties of his occupation." Dkt. # 45, Exs. A, B, C § 1.2.[1] The insured is partially disabled when "he is unable to perform one or more of the principal duties of his occupation; or to spend as much time at his occupation as he did before the disability started; and he has at least a 20% Loss of Earned Income." *Id.* at Exs. A, B, C, § 1.3.[2] The dispute between the parties revolves around the definition of "occupation." NW argues that Dr. George's occupation is and has always been that of a pathologist or dermatopathologist. Dr. George describes his occupation at the time of the onset of his disability as a general community hospital pathologist —an occupation he left in 2004.

---

[1]  *See also* Dkt. # 45, Ex. D § 1.4 ("[T]he Insured is totally disabled when unable to perform the principal duties of the regular occupation.").

[2]  *See also id.* at Ex. D § 1.5 (providing that the Insured must additionally be "gainfully employed in an occupation" to qualify for partial disability benefits).

Where policy language is clear and unambiguous, Washington courts enforce the provisions written "and do not modify the policy or create ambiguity where none exists." *Pub. Util. Dist. No. 1 v. Int'l Ins. Co.,* 124 Wash.2d 789, 797, 881 P.2d 1020 (1994). Ambiguity exists if the policy is susceptible to more than one reasonable interpretation, *Transcon. Ins. Co. v. Wash. Pub. Util. Dists'. Util. Sys.,* 111 Wash.2d 452, 456–57, 760 P.2d 337 (1988), and any ambiguity is interpreted in favor of the insured, *Sears v. Grange Ins. Ass'n,* 111 Wash.2d 636, 638, 762 P.2d 1141 (1988). Finally, definitions set forth in an insurance policy must be applied and undefined terms are given "their plain, ordinary, and popular meaning, as defined in standard English dictionaries." *Overton v. Consolidated Ins. Co.,* 145 Wash.2d 417, 427–428, 38 P.3d 322 (2002).

Here, the first three policies define "occupation" as "the occupation of the Insured at the time he becomes disabled." *Id.* at Exs. A, B, C, § 1.1. The fourth policy additionally provides that "[i]f the Insured is exclusively engaged in [ ] a medical or dental specialty for which board certification is available; or the specialty of trial law, that specialty is the 'regular occupation'." The dispute between NW and Dr. George is whether Dr. George's positions at UVA and UW are the same "occupation" as his position at Eastside Pathology. Save the definition contained in the fourth policy, the definition of "occupation" is circular, containing the word "occupation" in its definition. Accordingly, "occupation" must be given its plain and ordinary meaning.

**\*12** A Washington court faced with a similarly circular definition of the word "occupation" in a disability policy referred to a dictionary in defining the word as: "the principal business of one's life: a craft, trade, profession or other means of earning a living." *Scapa v. Provident Life and Accident Ins. Co.,* 108 Wash.App. 1017, 2001 WL 1085514, \*4 (Wash.App. Sep. 15,2001) (citing Webster's Third New International Dictionary 1560 (1969)). This Court will use the same definition.

The parties do not dispute that Dr. George's duties at Eastside Pathology consisted of spending 80% of his time examining specimens under the microscope with the remainder spent on intraoperative consultation, specimen evaluation and administrative, supervisory and educational activities. Dkt. # 45, Ex. G. The parties also do not dispute that Dr. George's time at UVA was spent previewing slides and skin specimens with a microscope, consulting on cases, attending teaching and patient care conferences, and reading and research. While working as a fellow at UVA, Dr. George spent 4–6 hours a day on a microscope, or approximately 36–55% of his 55–hour week, at a microscope. *Id.* Finally, the parties agree that Dr. George's current position at UW involves spending 33% of his time engaged in microscopic examination of specimens; 48% of his time engaged in education research, and administrative activities; 12% of his time teaching and supervising residents; and the remainder of his time engaged in intraoperative specimen evaluation. *Id.*

Based on these facts, the Court is satisfied that "the principal business" of Dr. George's life changed when he left Eastside

Pathology and again when he left UVA. During each of these transitions, the amount of time that Dr. George engaged in microscopic specimen evaluation decreased substantially. While gaining training at UVA, he spent a great portion of his day, if not the majority of it, doing work other than microscopic evaluation. Moreover, he was not being paid for his expertise, as he was at Eastside Pathology, but rather earned a stipend in order to build new expertise.

Similarly, in his role as clinical professor, Dr. George has taken on duties distinct to his new occupation as a clinical professor at UW—namely teaching and supervising residents. The fact that Dr. George still engages in some of the same activities of his former occupation at Eastside Pathology does not signify that he is necessarily engaged in the same occupation. [Indeed, an attorney who left private practice to teach at a law school would still be an attorney, and would still engage in some of the same research and writing activities he was engaged in while in private practice. His occupation, however, would have changed: his prior occupation or "means of making a living" would have been as an attorney engaged in private practice providing services to clients for a lucrative fee. His subsequent occupation "or profession" would be that of a law professor—teaching students, contributing to academia, and perhaps counseling some clients on the side. One can imagine a disability that would prevent an attorney from engaging in private practice that would not likewise prevent him from working as a law professor.] Based on this same reasoning, the Court holds that Dr. George's occupation changed when he left Eastside Pathology.

 **\*13**  Finally, given the definition of "occupation" adopted by the Court, the onset of Dr. George's disability is clearly dispositive to his breach of contract claim. There is no evidence that Dr. George's income has decreased, the amount of time he spends as a clinical professor has decreased, or that he has been rendered unable to perform any of the principal duties of his occupation as clinical professor. Therefore, if the onset of Dr. George's disability occurred after taking his position at UW, Dr. George's breach of contract claim fails. As to the issue of date of onset, the Court only notes that it is heavily factual in nature, it is hotly disputed by the parties[3], and is therefore inappropriate for summary judgment. For the forgoing reasons, NW's motion for summary judgment on Dr. George's breach of contract claim is DENIED.

[3]    For example, Dr. George testifies that he left Eastside Pathology because he was disabled, suggesting an onset date some time in 2004. *See* Dkt. # 70, p. 3:9–

16, p. 4. NW points to evidence that Dr. George had previously been pursuing a fellowship at UVA and was provided with a recommendation letter upon his departure vouching for his ability to perform his pathology work, suggesting he was not disabled when he left private practice. *See* Dkt. # 45, Ex. N.

4. *Bad Faith*

NW moves for summary judgment on Dr. George's bad faith claim. The operative question in insurance bad faith claims is "always whether the insurer acted reasonably under the facts and circumstances of the case." *Sharbono v. Universal Underwriters Ins. Co.,* 139 Wash.App. 383, 421, 161 P.3d 406 (2007). The question of whether an insurer acted reasonably under the circumstances is a question for the jury. *Id.* (citing *Smith v. Safeco Ins. Co.,* 150 Wash.2d 478, 484, 78 P.3d 1274 (2003)). However, a trial court may determine a factual question as a matter of law if reasonable minds could reach but one conclusion. *Smith,* 150 Wash.2d at 485, 78 P.3d 1274.

Here, NW's investigation of Dr. George's claim and administrative appeals appears exhaustive. However, Dr. George presents evidence that NW's review was insufficient because, for example, it relied on a cursory review by Dr. Alba, Dkt. # 68–1, p. 33; never contacted Dr. George's attending physician, Dkt. # 69–2, pp. 6–10; and failed to conduct a CPT code analysis though this is standard in the disability insurance industry, Dkt. # 69. In short, the evidence is not so overwhelming in NW's favor that bad faith is precluded as a matter of law. NW's motion for summary judgment as to Dr. George's claim for bad faith is DENIED.

**F. Dr. George's Motion for Partial Summary Judgment**

Dr. George seeks partial summary judgment on the issue of whether he is partially disabled as defined under the policy. The insured is partially disabled when "he is unable to perform one or more of the principal duties of his occupation; or to spend as much time at his occupation as he did before the disability started; and he has at least a 20% Loss of Earned Income." *Id.* at Exs. A, B, C, § 1.3.[4] The Court previously defined occupation as "the principal business of one's life: a craft, trade, profession or other means of earning a living." *See* Part II(D)(3), *supra.* "Unable" is not defined in the policy but will be given its plain and ordinary meaning of "not able" or "incapable." There is a disputed issue of material fact as to whether Dr. George is incapable of spending "as much time at his occupation as he did before the disability started." Accordingly, Dr. George's motion for summary judgment is DENIED.

| | |
|---|---|
| 4 | *See also id.* at Ex. D § 1.5 (providing that the Insured must additionally be "gainfully employed in an occupation" to qualify for partial disability benefits). |

**G. Motion to Strike**

**\*14** Dr. George moves to strike certain excerpts of Dr. Brent Benjamin's deposition transcript because they contain statements that are not based on personal knowledge and would not be admissible in evidence. *See* Fed.R.Civ.P. 56(c)(4). The Court did not rely on Dr. Benjamin's testimony in rendering its order on Defendant's motion for summary judgment. Accordingly, Dr. George's request to strike portions of Dr. Benjamin's testimony is MOOT.

**III. CONCLUSION**

The Court, having reviewed the parties' motions, the declarations and exhibits attached thereto, and the remainder of the record, hereby finds and ORDERS:

(1) Defendant Northwestern Mutual Life Insurance Company's Motion for Summary Judgment (Dkt.# 43) is GRANTED in part and DENIED in part.

(2) Plaintiff Dr. Evan George's Motion for Partial Summary Judgment (Dkt.# 50) is DENIED. Plaintiff's motion to strike (also Dkt. # 50) is denied as MOOT.

(3) Plaintiff's Motion to Consolidate Summary Judgment Hearings (Dkt.# 60) is DENIED.

(4) Defendant's Motion for Leave to Supplement Summary Judgment Record (Dkt. # 88) is GRANTED. Defendant's motion to amend its Answer (also Dkt. # 88) is likewise GRANTED. Defendant shall file an amended Answer within *7 days* of this order.

(5) The Clerk of the Court is directed to forward a copy of this order to all counsel of record.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3881476

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.